UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X



VERIZON NEW YORK INC., VERIZON NEW  :
ENGLAND INC., VERIZON NEW JERSEY INC., :
VERIZON PENNSYLVANIA INC., VERIZON    :
MARYLAND INC., VERIZON WASHINGTON,    :
DC INC. and VERIZON VIRGINIA INC.,    :
                                      :
                   Plaintiffs,        :          <u>DECISION AND ORDER</u>
                                      :
              - against -             :          1:03-cv-05073-ENV-RML
                                      :
GLOBAL NAPS, INC., GLOBAL NAPS        :
VIRGINIA, INC. and GLOBAL NAPS        :
SOUTH, INC.,                          :
                                      :
                   Defendants.        :
                                      :
----------------------------------------------------------------X

VITALIANO, D.J.

      Plaintiffs Verizon New York Inc., Verizon New England Inc., Verizon New Jersey Inc.,

Verizon Pennsylvania Inc., Verizon Maryland Inc., Verizon Washington, DC Inc., and Verizon

Virginia Inc. (collectively "Verizon") and defendants Global NAPS, Inc., Global NAPS Virginia,

Inc., and Global NAPS South, Inc. (collectively "Global") are two families of

telecommunications industry competitors partnered through a shotgun wedding orchestrated by

legislative policy designed to ensure the compatible, competitive, and cost efficient delivery of

telephony service, 47 U.S.C. § 151. The parameters of their interrelationship are set by the

Communications Act of 1934 ("1934 Act"), 47 U.S.C. §§ 151 <u>et seq.</u>, as amended by the

Telecommunications Act of 1996 ("TCA"), Pub. L. 104-104, 110 Stat. 56. Verizon brings this

action charging that Global breached the terms of their arranged marriage by not paying for

certain services Verizon had rendered and continues to render to Global as is required by federal law and regulation and the parties' agreements.

Verizon now moves for partial summary judgment. Its motion culls out of its overall complaint unpaid charges for transport services and facilities it provided to Global solely and exclusively to accommodate Global's own customers and pegs the amounts demanded to rates specified in Verizon's filed tariffs.[1] Global not only opposes Verizon's motion but also moves to dismiss the action in its entirety on the basis of the primary jurisdiction of the Federal Communications Commission ("FCC"), or, in the alternative, on the ground that both federal law and the parties' written agreements prohibit Verizon from levying the charges demanded.

Both sides agree that the matters raised on the motions can be resolved "simply." And, despite the mountain of papers filed on the motions and the hours of oral argument, both sides are correct. For the reasons stated below, both motions are also denied.

### Background

A.      Regulatory Framework

A brief review of the regulatory framework is necessary to place the parties' dispute in

---

[1] Verizon is a common carrier. See Cmplt. at ¶ 31. Common carriers, defined as persons "engaged as a common carrier for hire, in interstate or foreign communication by wire or radio," 47 U.S.C. § 153 (10), have a duty to "furnish such communication service upon a reasonable request therefor," 47 U.S.C. § 201 (a), pursuant to "just and reasonable" charges, 47 U.S.C. § 201 (b). The compilation of these charges are called "tariffs", which are filed with the FCC and available for public inspection, 47 U.S.C. § 203 (a). A similar system is generally followed where charges are subject to state rather than federal regulation.

context. The TCA amended the 1934 Act to create competition in the local telephone service market by requiring incumbent local exchange carriers ("ILECs"), like Verizon and its predecessors,[2] to allow competitive local exchange carriers ("CLECs"), like Global, to interconnect with their networks. Interconnection is the "the linking of two networks for the mutual exchange of traffic," 47 C.F.R. § 51.5, and "permits customers of one local exchange carrier to make calls to, and receive calls from, customers of other local exchange carriers," Global NAPS, Inc. v. Verizon New England, Inc., 444 F.3d 59, 62 (1st Cir. 2006).[3] An interconnection agreement must be in harmony with federal telecommunications law. To that end, an interconnection agreement must reflect several statutory obligations imposed by the TCA on incumbent and competitive local exchange carriers, including the "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251 (b) (5). Incumbent local exchange carriers have additional overarching statutory duties, including the "duty to negotiate in good faith . . . particular terms and conditions of agreements to fulfill the duties [including to establish reciprocal compensation arrangements, to negotiate, and

---

[2] Verizon is an amalgam of successor spin offs from the Bell Telephone Company. Some of the former Baby Bells comprising Verizon are Bell Atlantic and NYNEX. See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402 n.1 (2004).

[3] See also Destek Group, Inc. v. State of N.H. Public Util. Comm'n, 318 F.3d 32, 36 n.12 (1st Cir. 2003) ("An interconnection agreement is a contract between an ILEC and a telecommunications carrier linking their two networks together for mutual exchange consistent with the duties set out in [the 1934 Act]."); Southern New England Telephone Co. v. MCI WorldCom Communications, Inc., 353 F. Supp. 2d 287, 289 (D. Conn. 2005) ("ILECs and CLECs . . . satisfy their federal obligations by entering into 'interconnection agreements,' which govern all aspects of their relationship . . . .").

to interconnect] described in [§ 251 (b) and (c)]" and the duty to allow CLECs to interconnect with the ILEC's network.  47 U.S.C. § 251 (c) (1)-(2).

Disputes about where and how network interconnection is to be implemented often are, as they are here, the highly combustible source of controversy.  Technology does afford interconnection options but the choices are not unfettered.  To reject an interconnection point proposed by a CLEC, the ILEC must show that it is not technically feasible.  See 47 C.F.R. § 51.305 (e).  See also US West Comms., Inc. v. Jennings, 304 F.3d 950, 961 (9th Cir. 2002).  At the same time, "[w]hile the ILEC cannot be required to allow interconnection at technically unfeasible points, similarly the CLEC cannot be required to interconnect at points where it has not requested to do so." MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania, 271 F.3d 491, 517-18 (3d Cir. 2001).  Put another way, the right to pick the physical point of interconnection rests with the CLEC subject to technical feasibility.  See In re Petition of Worldcom, Inc., 17 F.C.C.R. 27039, 27074 ¶ 67 (2002).

Resolution of an interconnection controversy requires an understanding both of ever-changing technology and the developmental history of the telecommunications industry. Telecommunications regulation originated in an industry that was land based and wired.  Land line service, as opposed to wireless, is subdivided into local and long distance transmissions. The division between local and long distance is not necessarily by state or municipal boundaries; rather calls within a local access transport area ("LATA") are local, and those without are long distance.  See United States v. Western Elec. Co., 569 F. Supp. 990, 993 nn.4 & 9 (D.D.C. 1983). LATAs "delineate the areas in which the various [types] of telecommunications companies will

operate." Id. at 995. See also 47 U.S.C. § 153 (25). Local phone calls, i.e., those originating and

terminating within a single LATA, are generally handled by local exchange carriers, 47 U.S.C. §

153 (26), such service is known as telephone exchange service, 47 U.S.C. § 153 (47), and has

been referred to as "traditional local telephone service," United States v. Western Elec. Co., 969

F.2d 1231, 1233 (D.C. Cir. 1992). The essential elements of a local exchange carrier's network

are "the local loops (wires connecting telephones to switches), the switches (equipment directing

calls to their destinations), and the transport trunks (wires carrying calls between switches)."

AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371 (1999). Long distance calls, i.e., those

originating in one LATA and terminating in another, are generally handled by interexchange

carriers. See Western Elec. Co., 569 F. Supp. at 994 nn.14-15. See also Iowa Network Servs.,

Inc. v. Qwest Corp., 363 F.3d 683, 688 (8th Cir. 2004) (interexchange carriers provide "what

consumers would traditionally consider to be 'long-distance' telephone service."). An

interexchange carrier cannot complete a call without a local exchange carrier to make the local

connection: "When a customer makes a long distance call, the [interexchange carrier] must have

'access' to the local networks at both the originating and receiving end of the call in order to

complete the connection." WorldCom, Inc. v. Federal Communications Comm'n, 238 F.3d 449,

453 (D.C. Cir. 2001).

　　　To state the obvious, cost does attach to the provision of these services. One source of

payment is the reciprocal compensation provided for in 47 U.S.C. § 251 (b), which is further

defined by 47 C.F.R. § 51.703:

　　　　　　(a) Each LEC shall establish reciprocal compensation arrangements

for transport and termination of telecommunications traffic with any requesting telecommunications carrier.

(b) A LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network.

Reciprocal compensation, however, applies only to local traffic, 47 C.F.R. § 51.701 (b) (1), defined as "traffic that originates and terminates within a [LATA]." In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499, 1996 WL 452885, ¶ 1034 (1996). See also 47 C.F.R. § 51.1 (b) (stating that the purpose of the regulations is to implement 47 U.S.C. §§ 251, 252). "[I]nterstate or intrastate interexchange traffic," i.e. traffic between local areas, is not subject to reciprocal compensation; instead LECs charge the carriers of such traffic according to specified tariffs, "just as they did prior to enactment of the 1996 Act." In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499, 1996 WL 452885, at ¶ 1034. See also Southern New England Tel. Co. v. MCI WorldCom Communications, 353 F. Supp. 2d 287, 291 (D. Conn. 2005) ("[N]on-local calls, either interstate or intrastate, do not need reciprocal compensation because they already have a cost-recovery mechanism in place, namely, access charges.").

Once the ILEC and CLEC have concluded an interconnection agreement, the agreement is then submitted to the public utilities commission ("PUC") of the state where the LATA is

located for approval.[4]  See 47 U.S.C. § 252 (e).  If the parties negotiate the terms of an

agreement, they can choose to enter into a binding agreement "without regard to the standards set

forth in [§ 251 (b) and (c),]" but they must "include a detailed schedule of itemized charges for

interconnection and each service or network element included in the agreement."  See 47 U.S.C.

§ 252 (a) (1).  A PUC may only reject a voluntarily negotiated agreement if it "discriminates

against a telecommunications carrier not a party to the agreement" or "is not consistent with the

public interest, convenience, and necessity."  47 U.S.C. § 252 (e) (2) (A).  If, however, the parties

fail to arrive at terms through negotiation, they may petition the PUC to arbitrate any open issues.

See 47 U.S.C. § 252 (b) (1).  If an agreement was reached through arbitration, the PUC may

reject it on the additional ground that it does not comply with the interconnection duties set forth

in 47 U.S.C. § 251 and the FCC implementing regulations.  See 47 U.S.C. § 252 (e) (2) (B).

Thus, the parties may derogate from statutory obligations through agreement, and the agreement,

then, governs the parties' obligations.  See Iowa Utilities Bd., 525 U.S. at 372-73 ("When an

entrant seeks access . . ., the incumbent can negotiate an agreement without regard to the duties it

would otherwise have under § 251(b) or § 251(c).");  Cavalier Telephone, LLC v. Verizon

Virginia Inc., 208 F. Supp. 2d 608, 618 (E.D. Va. 2002) ("Under the 1996 Act . . . parties that

have entered into an interconnection agreement . . . are bound by that agreement and their

_____

[4] The FCC has jurisdiction over the regulation of interstate wire and radio
communications, 47 U.S.C. §§ 151, 152 (a), and the state PUCs over intrastate wire and radio
communications, 47 U.S.C. § 152 (b).  The FCC's rulemaking authority under 47 U.S.C. § 201
(b) extends to all provisions of the 1934 Act, though, including those added by the TCA such as
47 U.S.C. §§ 251 and 252.  See Iowa Utilities Bd., 525 U.S. at 378.

obligations are governed by that agreement.").

B. The Instant Dispute

The following facts are undisputed. Verizon is an ILEC as defined by 47 U.S.C.

§ 251 (h) (1) with relevant telecommunications operations in New York, Maine, Maryland,

Massachusetts, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Vermont, Virginia,

and the District of Columbia, that is, the same jurisdictions where Global began operating as a

CLEC, offering local and interexchange telephone services, in or about 1997. Verizon and

Global concluded interconnection agreements and established in each LATA where Global

sought access, except the District of Columbia,[5] physical points of interconnection ("POI"), that

is, locations where the "wires" of the Verizon and Global networks would physically meet. With

regard to the start-up agreements between the parties, in all states except Maryland, Verizon and

Global created state specific versions off of a template that they called the "Rhode Island

Agreement." Section 4.1.3 of the Rhode Island Agreement provides that

> [t]he parties shall establish interconnection points (collectively, the
> "Interconnection Points" or "IPs") at the available locations
> designated in Schedule 4.0. The IPs on the GNAPS network at which
> GNAPS will provide transport and termination of traffic shall be
> designated as the GNAPS Interconnection Points ("GNAPS-IPs"); the
> IPs on the [Bell Atlantic, Verizon's predecessor-in-interest] network
> from which BA will provide transport and termination via its network
> shall be designated as the BA Interconnection Points ("BA-IPs") and
> shall be either a BA terminating End Office serving the BA Customer
> or BA Tandem subtended by the terminating End Office.

---

[5] See Fox Aff. at ¶ 3; Fox 2d Aff. at ¶ 6.

In Schedule 4.0, both the Global IPs and the Bell Atlantic/Verizon IPs are listed as "TBD," for "to be determined." Each agreement was approved by the relevant state PUC.

The parties, of course, now disagree both as to the role of their agreements and as to their obligations under them. The parties do not dispute that they had agreed to share the costs of physically linking their networks in each LATA through an interconnection ring and that those charges have been satisfied by each side. They disagree, however, as to which party bears the responsibility of paying for the facilities and transport services needed to carry certain traffic after it has crossed the interconnection ring, moving from one network to the other. See, e.g., Oral Argument Trans. 77:1-93:21; 159:1-162:12 (Verizon); 121:7-128:7; 144:18-158:14 (Global).[6] Verizon argues that the agreements provide that Global is responsible for delivering traffic **originating** on its network to a point on the Verizon network designated by Verizon and that Global had, in fact, purchased transport services and related facilities from Verizon to meet those contractual obligations. To complete these purchases, Verizon contends, Global submitted Verizon Access Service Requests ("ASRs"), documents described by the parties as industry standard forms.

The ASRs are critical to the resolution of this dispute. Verizon contends that they are purchase orders. Global fervently disagrees. In any event, one of the key entries on the forms is the section requiring the designation of the percent of interstate usage ("PIU") the transport service or facility would carry. Any interstate telecommunications usage, Verizon claims, would

_____

[6] All references to the transcript are to the oral argument held by this Court on June 28, 2006.

not be subject to reciprocal compensation but subject instead to a separate charge pursuant to 47 C.F.R. § 51.701 (b) (1). As indicated on the ASRs executed by Global and sent to Verizon, the vast majority of the transport services and facilities ordered were to carry interstate traffic. Verizon contends further that it set up and maintained the transport services and facilities for Global pursuant to the ASRs and that, despite being billed regularly, Global has yet to pay a penny of these charges. Verizon pleads, lastly, that the charges billed to Global for establishing and maintaining these services and facilities are calculated pursuant to the access tariffs it had previously filed with the FCC or the appropriate state regulatory agency as a common carrier.[7]

Global, on the other hand, argues that once a telephone call originated by a Global customer and destined for a Verizon customer reaches the relevant interconnection ring, its obligations are fulfilled. Any transportation of that call on the Verizon network, including any facilities needed to effectuate that transportation, beyond the interconnection ring, it argues, is the responsibility of Verizon. Then, to dispel any notion that the ASR's confirm a contrary view, Global avers that Verizon compelled it to use the ASR forms by threatening that it would otherwise not deliver Global traffic at all. Global insists that it did not order transport services or facilities from Verizon for purchase, but rather used the ASRs only to designate the portions of Verizon's network Global expected its traffic would travel on and to indicate what services and facilities it anticipated Verizon would need on its network to handle Global's traffic. Global

---

[7] The only tariffs relevant on this motion are the federal tariffs Verizon filed with the FCC. Verizon, in demanding partial summary judgment, seeks only recompense for transport services and facilities designated for interstate traffic and only pursuant to the federal tariffs. See Oral Argument Trans. 163:6-164:7.

further avers that Verizon required Global to categorize its traffic as predominantly interstate to reserve the right to deliver any interstate calls to Verizon's customers. So, Global concludes, Verizon sues not to vindicate its contractual rights but to seek judicial approbation for the avoidance of its contractual obligations, that is, Verizon sues in an attempt to pass along to Global the cost of building and maintaining facilities and services on Verizon's network that Verizon was contractually obliged to provide to Global without charge.

The essence of the dispute is unaffected by the second generation of contracts between the parties. It is uncontested that, beginning in 2002, Verizon and Global renegotiated and/or arbitrated their interconnection agreements in each state.[8] In Delaware, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont, arbitrated agreements replaced the original Rhode Island Agreement. In Maryland an older agreement, from December 6, 1999, remains in effect, and the original "Rhode Island Agreement" remains in effect in Virginia. Global cites the arbitrated agreements to support its position that it was entitled to a single point of interconnection per LATA and that each party was obligated to bear only the cost of transporting traffic on its side of the POI. Verizon counters that the proceedings before the PUCs are not relevant to its instant motion as the filed rate claims are based on federal tariffs and outside the purview of the PUCs.

The cauldron of controversy soon began to simmer. Beginning February 2003, Verizon

---

[8] As to the timing, Global states that the New York interconnection agreement was to expire December 31, 2000 and the other interconnection agreements after 36 months by their terms. See Fox 1st Aff. at ¶ 14.

invoked what it characterizes as a recoupment or set-off as a self-help measure to recover its unpaid charges from Global. As a result, Verizon has not paid Global usage sensitive charges for Internet traffic Verizon hands off to Global nor has it paid Global fees for terminating non-Internet calls originating on the Verizon network as would be required as part of its obligation to pay intercarrier compensation. In or about September 2003, Global made an application to the FCC regarding Verizon's refusal to pay it intercarrier compensation, the subject of Verizon's set-off. Although the parties disagree as to the nature of the application by Global to the FCC and what followed, it would seem that after an initial meeting with the FCC, the matter before the FCC was terminated. This lawsuit ensued.

## Procedural History

Verizon commenced this action on October 7, 2003, alleging Global violated the 1934 Act by not paying Verizon at the filed tariff rate for the facilities and services it had ordered and for breach of contract. Verizon's demand for relief was $8,961,217.84 in damages, as of the date of the complaint but continuing to accrue, plus late payment charges and attorney's fees. In addition, Verizon sought and continues to seek a declaratory judgment against Global, pursuant to 28 U.S.C. § 2201, that Verizon may exercise its common law rights of set-off or recoupment and retain amounts that would otherwise be due to Global.

Verizon subsequently moved for partial summary judgment on its filed rate claims for all

amounts billed but unpaid as of the date of the motion, totaling $7,610,897.04,[9] and for a declaration that Global is obligated to pay the invoices for these same transport services and facilities going forward. Global moved to dismiss, arguing alternatively that the complaint should be dismissed without prejudice because the FCC has primary jurisdiction or, if the Court does not defer to FCC jurisdiction, that the Court grant substantive dismissal because the agreements prohibit Verizon from charging for the subject transport services and facilities. During the pendency of the motions, the action was transferred to this Court on March 29, 2006. On June 5, 2006, Verizon moved by order to show cause for an order of attachment, a temporary restraining order, and expedited discovery. Pending the hearing of that motion, Global was temporarily restrained from transferring any assets "except for the payment of goods and services provided to defendants in the ordinary course of any current business." The Court heard oral argument on the attachment motion on June 20, 2006, denied the requested relief from the bench for the reasons stated on the record, and vacated the temporary restraints. Additionally, Global's request for supplemental briefing on Verizon's motion for partial summary judgment and Verizon's request for expedited discovery were denied. The Court then held protracted oral argument on the instant motions on June 28, 2006. They are determined by this Decision and Order.

---

[9] In this motion for partial summary judgment, Verizon is pursuing monies it alleges it is owed pursuant to federal tariffs for interstate services and facilities and not state tariffs for intrastate services and facilities, accounting for the difference between the $7,610,897.04 claimed on this motion and the $8,961,217.84 claimed in the complaint. See Verizon Memorandum of Law in Support of Motion for Partial Summary Judgment at 14-15; Moreschi Aff. at ¶¶ 4-7.

**Discussion**

A.     <u>Global's Motion to Dismiss</u>

    1.     The Standard

Federal Rule of Civil Procedure 12 (b) (6) allows a party to assert the defense of "failure

to state a claim upon which relief can be granted" in a motion. However, it is elemental that " 'a

complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "

<u>Dahlberg v. Becker</u>, 748 F.2d 85, 88 (2d Cir. 1984) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41,

45-46 (1957)), <u>cert</u>. <u>denied</u>, 470 U.S. 1084 (1985). The role of the court in considering a motion

to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the

evidence which might be offered in support thereof," <u>Geisler v. Petrocelli</u>, 616 F.2d 636, 639 (2d

Cir. 1980). " '[T]he issue is not whether a plaintiff will ultimately prevail but whether the

claimant is entitled to offer evidence to support the claims.' " <u>Villager Pond, Inc. v. Town of</u>

<u>Darien</u>, 56 F.3d 375, 378 (2d Cir. 1995) (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).

Therefore, the Court must, on Global's motion, "accept as true the factual allegations of

the complaint, and draw all inferences in favor of the pleader." <u>Mills v. Polar Molecular Corp.</u>,

12 F.3d 1170, 1174 (2d Cir. 1993). <u>See also</u> <u>LaBounty v. Adler</u>, 933 F.2d 121, 123 (2d Cir.

1991). Although a court is not strictly limited to the four corners of the complaint, it "must limit

itself to a consideration of the facts alleged on the face of the complaint, and to any documents

attached as exhibits or incorporated by reference." <u>Cosmas v. Hassett</u>, 886 F.2d 8, 13 (2d Cir.

1989). <u>See also</u> <u>LaBounty</u>, 933 F.2d at 123 ("Rule 12 (b) (6) does not give the district court

14

authority to consider matters outside the pleadings; it simply delineates the procedures which must be followed in testing the legal sufficiency of a complaint."). See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (citation omitted); Cortec Industries Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991). Here, the interconnection agreements executed by the parties, which are referenced and relied upon throughout the complaint and motion papers, qualify as such documents

### 2. Primary Jurisdiction

Global's motion at its core is, however, less a motion to dismiss than an application that this Court defer to another body, the FCC, which it argues is better able to resolve technical issues of universal concern to the telecommunications industry as a whole but which, it argues further, lie at the root of the dispute between the parties here. Given the avalanche of technological advances in telecommunications and the intense regulation of the industry's service delivery, the argument for deference has much surface appeal since the primary jurisdiction doctrine "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of [an] administrative body." Golden Hill Paugussett Tribe v. Weicker, 39 F.3d 51, 58-59 (2d Cir. 1994) (citing United States v. Western Pac. R. Co., 352 U.S. 59, 64 (1956) and Ricci v. Chicago Mercantile Exch., 409 U.S. 289 (1973)). The doctrine enables a court to "refer" such issues to the relevant agency and then

stay the proceedings or dismiss the case without prejudice. See Reiter v. Cooper, 507 U.S. 258, 268-69 (1993). See also National Communications Ass'n v. AT&T, 46 F.3d 220, 222-23 (2d Cir. 1995) ("The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight. Specifically, courts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency.") (quoting Far East Conference v. United States, 342 U.S. 570, 574 (1952)).

Whether or not to apply the doctrine of primary jurisdiction is a matter left to the sound discretion of the trial court. "In every case the question is whether the reasons for the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Western Pacific, 352 U.S. at 64. Those purposes are "[1] consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and [2] the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims." Golden Hill, 39 F.3d at 59. See also Tassy v. Brunswick Hosp. Ctr., Inc., 296 F.3d 65, 68 (2d Cir. 2002) ("[T]he reasons for its existence and the purposes it serves are twofold: the desire for uniformity and the reliance on administrative expertise.").

Although "[n]o fixed formula has been established for determining whether an agency has primary jurisdiction," the Second Circuit has identified four factors to be used to "focus the analysis":

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

National Communications Ass'n v. AT&T, 46 F.3d 220, 222 (2d Cir. 1995). Additionally, "[t]he

court must also balance the advantages of applying the doctrine against the potential costs

resulting from complications and delay in the administrative proceedings." Id. at 223. For

example, primary jurisdiction has been applied "when an action . . . raises a question of the

validity of a rate or practice included in a tariff filed with an agency, particularly when the issue

involves technical questions of fact uniquely within the expertise and experience of an agency

such as matters turning on an assessment of industry conditions." Nader v. Allegheny Airlines,

Inc., 426 U.S. 290, 304 (1976) (internal citations omitted).

Global argues that because the majority of the traffic moving on its network is Voice over

Internet Protocol ("VoIP") traffic,[10] a new and uncategorized form of telecommunication, the

_____

[10] VoIP traffic is Internet protocol enhanced telecommunications traffic and can encompass several different types of service:

[O]ne VoIP service . . . may be offered to the general public as a means of communicating with anyone, including parties reachable only through the public switched telephone network. Other VoIP offerings involve the capability to communicate on a peer-to-peer basis only with other members of a closed user group . . . . Still other

doctrine of primary jurisdiction requires referral of this action to the FCC to promote consistency and uniformity in an area regulated by that federal agency and because the FCC has the necessary technical expertise to resolve controversies relating to such a new telecommunications form.

Verizon does not refute that the majority of Global's traffic is VoIP, Masuret Aff. at ¶ 6, but counters that the primary jurisdiction doctrine is inapplicable because the case does not present any technical or policy-based issues within the FCC's particular field of expertise. Rather, so Verizon argues, the case presents the simple matter of unpaid billing with money damages to be calculated pursuant to previously filed tariffs. Verizon contends that Global's emphasis on the amorphous and cutting edge nature of VoIP traffic is merely a red herring designed to distract the Court. By limiting its claim to transport services and facilities charges related to particular traffic Global had acknowledged in orders placed with Verizon was "interstate," and thus exempted from the reciprocal compensation requirements of 47 U.S.C. ¶ 251 (b) (5) and 47 C.F.R. § 51.701, Verizon argues that there is nothing for the FCC to decide and, in fact, nothing for this Court to do other than order Global to pay at the tariffed rate for the

---

> VoIP capabilities may be additional features of other services or
> applications that enable voice communications with a particular user
> group such as between Xbox users during an interactive game session
> or voice-enabled Instant Messaging.

In the Matter of Communications Assistance for Law Enforcement Act and Broadband Access and Services, 2004 WL 1774542 (F.C.C.), 19 F.C.C.R. 15,676 (2004) at ¶ 53 (footnotes omitted). A conceptual distinction has been drawn between managed VoIP services, which allow calls to be placed to traditional telephone networks, and non-managed VoIP services, which provide peer-to-peer communications, i.e. computer to computer, and/or voice operated Instant Messaging. See id. at ¶ 58. The VoIP matters in issue on this lawsuit deal only with so-called managed VoIP services. See Oral Argument Trans. 5:11-14; 7:10-14.

orders it had placed.

No one, however, quarrels with the obvious: the FCC is charged with implementing the 1934 Act, including its local competition provisions, Iowa Utilities Bd., 525 U.S. at 377-78 (citing 47 U.S.C. § 201(b)), and that the agency is, in fact, aware of a myriad of issues raised by Internet-based calling. For example, the FCC recently found that, with respect to Vonage's DigitalVoice service, there is "no practical way to sever DigitalVoice into interstate and intrastate communications" and, accordingly, preempted an order of the Minnesota PUC that designated Vonage as a telecommunications carrier as opposed to a provider of information services and which required it, inter alia, to file tariffs. The FCC went on to observe: "Similarly, to the extent that other VoIP services are not the same as Vonage's but share similar basic characteristics, we believe it highly unlikely that the Commission would fail to preempt state regulation of those services to the same extent." In re Vonage Holding Corp., 19 F.C.C.R. 22,404, 2004 WL 2601194 (2004) (citing In re IP-Enabled Servs., 19 F.C.C.R. 4863, 2004 WL 439260 (2004)). See also Vonage Holdings Corp. v. Minnesota Public Utilities Comm'n, 290 F. Supp. 2d 993 (D.Minn. 2003), aff'd, 394 F.3d 568 (8th Cir. 2004). The FCC further reiterated its intent to address "questions regarding the regulatory obligations of providers of IP-enabled services [like VoIP]" in a pending rule-making proceeding. In re Vonage Holding Corp., 19 F.C.C.R. at 22,404. See also In re Developing a Unified Intercarrier Compensation Regime, 16 F.C.C.R. 9610, 2001 WL 455872 (2001) ("[T]here are currently two general intercarrier compensation regimes: (1) access charges for long-distance traffic; and (2) reciprocal compensation. We believe it essential to re-evaluate these existing intercarrier compensation regimes in light of

19

increasing competition and new technologies, such as the Internet and Internet-based services . . . ."); Developing a Unified Intercarrier Compensation Regime, 20 F.C.C.R. 4685, 2005 WL 495087 (2005) (further notice of proposed rulemaking); In the Matter of Communications Assistance for Law Enforcement Act and Broadband Access and Services, 19 F.C.C.R. 15,676, 2004 WL 1774542 (2004) (For the purposes of the Communications Assistance for Law Enforcement Act (CALEA), 47 U.S.C. §§ 1001-1010, the FCC "tentatively conclude[d] that providers of managed VoIP services, which are offered to the general public as a means of communicating with any telephone subscriber, including parties reachable only through the [public switched telephone network], are subject to CALEA" as telecommunications carriers).

These musings by the FCC about a new regulatory day to come give birth to Global's reply to Verizon's opposition to deferral of jurisdiction by this Court. The thrust of Global's argument is that the very nature of the traffic it transmits–VoIP–has not been determined by the FCC and that, in the absence of such determination, this Court cannot properly categorize it and apply the TCA correctly. To be sure, where a specialized agency created by Congress is shown to be aware of a service within the ambit of its regulatory jurisdiction and forecasts a day will come when it might take action, that fact certainly is probative on the first and second prongs of the test established by the Second Circuit in National Communications Ass'n v. AT&T. But, it is hardly dispositive of those first two prongs much less of the test as a whole.

There are several fatal flaws in Global's argument. First and foremost, it is not essential to determine what the entire regulatory regime for VoIP traffic should be in order to determine the dispute pending before the Court. Critically, as is currently the case regarding traditional

20

reciprocal compensation, even if the FCC had made such a determination, the parties would have been free to opt out of any such regulatory regime by a mutual nondiscriminatory, arms length agreement. See Iowa Utilities Bd., 525 U.S. at 372-73; Verizon Maryland, Inc. v. Public Service Comm'n of Maryland, 535 U.S. 635, 638-39 (2002).

Shotgun wedding notwithstanding, the parties have developed a complex technical and contract-based infrastructure of long standing to deliver for their customers a variety of telecommunications services. VoIP traffic delivery is certainly one of them; in fact, Global acknowledges that the lion's share of the traffic covered by the agreements now before the Court was VoIP traffic **when the agreements were executed**. See Masuret Aff. at ¶ 6. Neither side was waiting for the FCC to decide VoIP's regulatory regime when they made their bargain. And, what is in issue here is the bargain. Who pays for what **as agreed**.

Ultimately, Verizon is correct: at its essence the dispute is a billing dispute. There is no reason to wait for Godot or the adoption of a regulatory scheme for VoIP traffic by the FCC. The determination of disputed contractual obligations is well within the conventional experience of the district court.

This point dovetails well in applying the second and fourth prong of the test. Although the FCC is quite appropriately concerned with creating a uniform scheme to regulate VoIP traffic going forward, when the parties brought to the FCC their contractual dispute arising out of the VoIP traffic that they were actually handing off to each other every day, Cmplt. at ¶ 36, the FCC took a pass and sent them packing. See Ingram Aff. in Opposition to Motion to Dismiss at ¶¶ 4-5, 13. It was a response that is most instructive. Obviously, the FCC had to be well aware of the

21

existence of substantial VoIP traffic in the telecommunications marketplace otherwise it would

not be pondering overall regulation. Equally obvious, the FCC had to be aware also that the

existing VoIP traffic was moving at someone's expense. The fact that neither on the complaint

of Global nor in any other proceeding referred to us by the parties has the FCC deemed it

necessary to intervene to upset compensation schemes involving such traffic agreed to by the

carriers, see, e.g., In re Vonage Holding Corp., 19 F.C.C.R. at 22,404, leads to the inescapable

conclusion that the FCC is in the interim deferring to the existing intercarrier agreements as

controlling such billing issues and has left for courts or arbitration to resolve any contractual

disputes about VoIP traffic arising out of them.

Further analysis of the third and fourth prongs of the test through the prism of the

approach taken by the parties in not dissimilar contexts elsewhere also undermines the argument

for deferral of any part of this controversy to the FCC. Specifically, neither Global nor Verizon

have been shy in turning to the courts for resolution of disputes relating to their interconnection

obligations and agreements, including novel issues like the regulation of virtual NXX telephone

numbers. See, e.g., Global NAPs, Inc. v. Verizon New England, Inc., 454 F.3d 91 (2d Cir. 2006)

(reviewing PUC's regulation of virtual NXX telephone numbers); Southern New England Tel.

Co. v. Global NAPs, Inc., 2006 WL 1169805 (D. Conn. 2006) (applicability of arbitration

provision in interconnection agreement); Global NAPS, Inc. v. Verizon New England, Inc., 444

F.3d 59 (1st Cir. 2006) (whether FCC preempted state regulation of intercarrier compensation for

non-local Internet service provider bound calls); Verizon Maryland, Inc. v. Global NAPS, Inc.,

377 F.3d 355 (4th Cir. 2004) (whether federal court has jurisdiction over claim that PUC

misinterpreted interconnection agreement provisions on reciprocal compensation and whether PUC had authority under federal law to impose reciprocal compensation terms in arbitration proceedings). Parties with ongoing business relationships and ongoing litigation in multiple forums always face a risk of inconsistent decisions regardless of the nature of their disputes. The parties have submitted disputes similar to the one at bar to other courts and to the PUCs. Were this Court to defer to the FCC, the decision to defer would not alleviate the risk of inconsistent decisions; a risk certainly inherent in Global's determination to walk away from its prior application to the FCC seeking FCC intervention to resolve the very dispute now before the Court. Given this history in particular, a winning argument for deferral is hard to discern. Indeed, all that can be said with definiteness is that deferring to the FCC would serve to slow the resolution of the matters in dispute, an important factor in and of itself weighing against deferral.

Finally, the Court observes that Global made a similar primary jurisdiction argument in an action brought by another ILEC, which sued Global for, inter alia, nonpayment on invoices covering 26 special access circuits Global "ordered pursuant to the terms and conditions for special access services" set forth in the ILEC's federal tariff. Southern New England Tel. Co. v. Global NAPs, Inc., 2005 WL 2789323 at *1-*2 (D. Conn. 2005). The district court partially denied Global's primary jurisdiction motion, holding

> SNET contends instead that the special access circuit claims are "collection action claims" to which the primary jurisdiction doctrine does not apply. Given the allegations contained in SNET's complaint—that Global NAPS actually and specifically ordered twenty six circuits pursuant to the plaintiff's federal tariff—it is unclear to the court at this juncture why SNET's special access claims would require the type of policy-minded interpretative analysis that the

23

> defendant urges. SNET's claims, at least at this stage of the
> litigation, appear to involve factual questions concerning whether
> Global NAPS actually purchased the circuits that SNET says that it
> has, and whether it actually failed to compensate SNET for them.

Id. at *6.[11] In the instant matter, the crux of the dispute is what, if anything, Global ordered and

at what, if any, charge. It is a dispute arising out of business relationships forged, if not forced,

by federal law and regulations and, therefore, touching upon matters unresolved by the FCC in

the teeth of technology's advances. Though it is also likely that the parties will disagree about

how the FCC should regulate VoIP telecommunications traffic and resolve other open matters,

that aspect of their dispute need not be resolved here nor should it afford a ground to defer any

portion of the pending filed rate claims to await FCC resolution of these issues.

Indeed, with this Court's determination that deferral to the FCC on the ground of primary

jurisdiction is unwarranted, the fundamental question open on Global's motion to dismiss is

whether the business dispute framed in Verizon's complaint is sufficiently well-plead to survive

---

[11] At oral argument, counsel for Global argued that the Connecticut district court had been
compelled to construe the facts against Global and that its decision was based on Southern New
England's "assertion that all of the traffic here is not VoIP." Oral Argument Trans. 111:24-25.
In that case, Southern New England raised two categories of claims: one was that Global
deliberately misrouted calls and thereby prevented Southern New England from collecting the
information necessary to bill the long distance carriers responsible for the call in violation of the
interconnection agreement; the other that Global ordered 26 special access circuits off Southern
New England's tariffs and failed to pay for them. In its complaint, Southern New England only
admitted that a small percentage of Global's traffic was IP-enabled or VoIP. The district court
deferred to the FCC only on the misrouting claims and only those dealing with IP-enhanced
traffic. With regard to the 26 special access circuits, the district court held that whether Global
purchased these circuits and whether Global failed to pay for them were factual questions not
requiring the FCC's policy knowledge or expertise. See Southern New England Tel. Co. v.
Global NAPs, Inc., 2005 WL 2789323 at *3-*6.

traditional challenge under Rule 12. Because it cannot be said, viewing Verizon's complaint in the light most favorable to Verizon as the nonmoving party, including, for example, Verizon's interpretation of the ASRs as Global's orders to purchase certain transport services and facilities at the tariffed rate, that the complaint is legally unfeasible or factually unprovable, Verizon survives the Rule 12 challenge. The only question now remaining is whether Verizon has offered enough in admissible proof not only to survive Rule 12 but actually to entitle it to an award of partial summary judgment under Rule 56.

B.    Verizon's Motion for Partial Summary Judgment

1.    The Standard

Federal Rule of Civil Procedure 56 (c) provides for the grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact is "material" for these purposes when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of demonstrating that no issue as to any material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In reviewing a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party and draw all inferences in that party's favor. See Niagara Mohawk Power Corp. v. Jones Chem.,

25

Inc., 315 F.3d 171, 175 (2d Cir. 2003). The relevant question is not whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." Anderson, 477 U.S. at 252. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

A motion for summary judgment, on the other hand, cannot be defeated by "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. Accordingly, the nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). Put another way, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

Although Rule 56 permits a plaintiff to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action," Fed. R. Civ. P. 56 (a), "the rule contemplates that summary judgment will be granted only 'after adequate time for discovery.' " Patton v. General Signal Corp., 984 F. Supp. 666, 670 (W.D.N.Y. 1997) (quoting Celotex, 477 U.S. at 322). As a result, "pre-discovery summary judgment remains the exception rather than

26

the rule, and will be granted only in the clearest of cases." Id. (citation and internal quotation marks omitted). See also Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 (2d Cir. 1983) (noting that, even when discovery is underway, "summary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information").

### 2. The Filed Rate Doctrine

Verizon's motion for partial summary judgment seeks recovery for claims based on the "filed rate doctrine." The filed rate doctrine allows a party to "collect charges pursuant to a tariff," if it "demonstrate[s] (1) that [it] operated under a federally filed tariff and (2) that [it] provided services to the customer pursuant to that tariff." Advamtel, LLC v. AT & T Corp., 118 F. Supp. 2d 680, 683 (E.D. Va. 2000). "The practical effect of the filed rate doctrine is to preclude customers from . . . challenging a utility's failure to provide services at a rate other than that set forth in the published tariff." Katz v. MCI Telecomm. Corp., 14 F. Supp. 2d 271, 274 (E.D.N.Y. 1998) (citing, inter alia, Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998)). According to Verizon, if a customer like Global specifies that the percentage of interstate use will exceed 10 % over a special access line, as Global did on the ASRs, then the line is considered interstate and governed by the FCC tariff. Verizon then calculates the tariffed rate based on a fixed formula taking into account the services and facilities ordered by the customer. See Moreschi Aff. at ¶¶ 6-8.

Verizon contends that for telecommunications traffic originated exclusively by a Global customer and bound for a Verizon customer the interconnection agreements required Global to provide for transport services and facilities not only from the point where the individual Global

27

customer's call originated on the Global network and to the "interconnection ring"[12] but also

from the interconnection ring to a Verizon designated IP or end office. Further, Verizon claims,

Global chose to purchase these transport services and facilities on the Verizon side of the

interconnection ring from Verizon, as opposed to providing them itself, and evidenced its

purchase decision by completing an ASR order form provided by Verizon. Verizon then

invoiced Global for these purchases at the price listed in its published tariff. See Smith Aff. at

¶¶ 6, 9; Moreschi Aff. at ¶¶ 10-11. It is conceded by Global that these invoices are unpaid. On

its instant motion for partial summary judgment, Verizon demands that Global pay damages in

full satisfaction of the filed rate charges reflected on those invoices.

Pared to its essence, Verizon's argument is that the ASRs are dispositive of its motion for

summary judgment. And, they are. Unfortunately for Verizon, they command that summary

judgment be denied.

It is important to note that Verizon is not moving for summary judgment on any cause of

action other than the one asserting its filed rate claims. To succeed on such claims, Verizon must

show that the transport services and facilities in issue were, in fact, purchased by Global pursuant

to Verizon's tariffs. Even more, to succeed at summary judgment, Verizon must establish,

viewing the admissible proof in the light most favorable to Global, that there are no material

facts to the contrary.

Global heatedly insists that there is ample proof of material facts to the contrary and,

---

[12] Global agrees it is obligated to bear this portion of the costs but contends those are the only costs it is responsible for in conjunction with such traffic.

assuredly, that there exists a fact based genuine controversy. Attacking Verizon's position head

on, Global offers the sworn statement of Robert Fox, Vice President of Industry Relations for

Global, that Global did not place any purchase orders with Verizon. The ASRs were not order

forms, he continued, but rather forms Verizon compelled Global to use merely to designate over

what portion of Verizon's network Global originated traffic was expected to flow and to identify

any additional build-outs required to handle the anticipated traffic. See 2d Fox Aff. at ¶¶ 12-14.

In an email to Verizon, Fox wrote:

> We have ordered interconnection trunking using Access Service
> Requests (ASRs). Verizon representatives told us the ASR was the
> only ordering method Global NAPs could use to order
> interconnection trunks. This has caused us to be billed FCC rates.
> What is the proper method or form for Global NAPs to use to order
> interconnection trunking, and not be billed FCC rates?

Fox 2d Aff. Ex. Verizon responded: "The ASR is the standard for ordering trunks." Id. Global

offers, further, the sworn statement of Jeffrey Noack, Director of Network Operations for Global,

that ASRs, as they are understood in the industry, are not purchase orders, but requests to

provision services and facilities and are used for that purpose regardless of whether a tariff, or

indeed any charge, applies. See Noack Aff. in Opposition to Attachment Motion at ¶¶ 23-28.

Verizon's retort is full of bluster but fails considerably to mute the demonstration by

Global of the existence of material, indeed critical, facts very much in dispute. For the most part,

Verizon's argument is rhetorical. Why, given Global's obvious sophistication in the industry

with executives nurtured at Verizon or its predecessors, would Global continue to use the

Verizon ASRs to order transport services and facilities knowing that the use of the ASRs had

29

generated invoices billing Global for those provisions at the filed tariff rate? See Smith Reply Aff. at ¶¶ 2-3. Verizon also points to the Pollyannaish explanation by Global of its self-characterization on the ASR form of the traffic to flow on the provisioned services and facilities as "interstate" merely because Verizon told Global to fill in the form that way. See Fox 2d Aff. at ¶ 17. Questions and arguments perhaps helpful to Verizon at trial but hardly helpful in demonstrating the absence of material facts in dispute.

To be sure, Global is saddled at trial with the way it executed the ASRs. The documents say what they say. But, there is nothing within the four corners of those documents that expressly obligates payment for "access to services requested," which, after all, is the meaning of the acronym "ASR". Moreover, Verizon refers the Court to no entry in its tariff filings that would put anyone on notice that the use of an ASR would **automatically** trigger an agreement to pay the tariffed rate for the service requested. It is not enough to carry the day for Verizon at summary judgment that the prices it charged Global for the services provided were, in fact, the prices set forth in the tariff. See Smith Aff. in Opposition to Motion to Dismiss at ¶ 16. Verizon's sworn statements offered on the motion do not offer proof beyond the fact of the congruency of the ASR billing rate and the tariff rate. There is no proof offered by Verizon that Global ever expressly stated orally or in writing that it was purchasing provisions off the tariff without regard to anything else, which is the claim presented on the motion. See Smith Aff. in Opposition to Motion to Dismiss at ¶¶ 6-10. Bluntly, Verizon does not come to grips at all with Global's bedrock defense that it made no purchases, much less off a tariff, but was only directing through the ASRs the installation of transport provisions which, under its view of reciprocal

30

compensation, it was owed by Verizon without any additional charge. See Fox 2d Aff. at ¶ 16.

Verizon has struggled mightily to distinguish its claim under the filed rate doctrine from its other contract based claims. It cannot do so, and, therefore, it cannot succeed. The most powerful demonstration of the integrated nature of Verizon's claims, including its filed rate claim, is presented in Verizon's own response to Global's abortive effort to seek relief on its disagreement with Verizon by filing a complaint with the FCC.

What stands out in Verizon's response to Global's FCC complaint is Verizon's argument that its claim for payment of the transport provisions ordered by Global arises not as a matter of tariff alone but because Global had agreed to such charges in the interconnection agreements and in state memoranda of understanding. See Verizon FCC Meditation Statement, Exhibit 2 to Ingram Aff. in Opposition to Motion to Dismiss at 1-2; Oral Argument Trans. 84:11-85:18. The subsidiary nature of the tariff in Verizon's eyes and argument then is manifest. Verizon argued to the FCC that Global's obligation to pay for the services it ordered came from the agreements; the price for the services provided is what alone came from the tariffs. See Verizon FCC Meditation Statement, Exhibit 2 to Ingram Aff. in Opposition to Motion to Dismiss at 1-2; Oral Argument Trans. 84:8-10; 85:19-20. Verizon's argument then helps torpedo summary judgment now. Put another way, to succeed on summary judgment under the filed rate doctrine, Verizon must show that Global ordered the transport services and facilities pursuant to the tariff alone, not just that the tariff served as a pricing mechanism. Otherwise, Global's defense to the filed rate claim is far from fanciful. Quite to the contrary, it would, clearly, raise sufficient genuine questions of material fact requiring resolution by trial.

31

The only remaining hope Verizon might have had for summary judgment on its filed rate claim would be incontrovertible proof that some agreement between the parties unambiguously settled upon Global the financial responsibility for the transport services and facilities Global commissioned Verizon to install through the ASRs on the Verizon side of the interconnection ring to handle exclusively traffic generated by Global customers to be terminated by its transmission to a Verizon customer **and** to prove, additionally, that the charges to be imposed for such services and facilities were those set forth in Verizon's tariffs. Verizon's inability to proffer such incontrovertible proof on this motion was ominously foreshadowed by Verizon's studious avoidance of advancing for summary resolution any claim reliant upon contract interpretation. On this point the parties do agree: with respect to the interpretation of their interconnection agreements and other contractual memoranda there are genuine issues of material fact in dispute. What the parties agreed to in their interconnection agreements and memoranda of understanding will, of course, provide the basis for the ultimate resolution of this action. But since contract interpretation is in dispute, the agreements provide no basis for summary resolution, including of the narrowly focused claim now before the Court. Accordingly, since Verizon has not provided the incontrovertible Rosetta stone unlocking the true meaning of the ASRs sent by Global to Verizon, Verizon's motion for partial summary judgment must be denied.

## Conclusion

For the foregoing reasons, Global's motion to defer jurisdiction to the FCC or, alternatively, to dismiss and Verizon's motion for partial summary judgment are both denied in

their entirety. Global is directed to answer the complaint. Magistrate Judge Robert M. Levy is respectfully requested to place and keep the parties on an expedited discovery track.

DATED:     Brooklyn, New York
           November 28, 2006

                                         _____
                                         ERIC N. VITALIANO
                                         U.S.D.J.